**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————————

**No. 18-4269**

—————————————

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

JAMES ROBERT PETERSON,

        Defendant – Appellant.

_____

**No: 18-4270**

_____

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

SOK BUN, a/k/a Friday,

        Defendant - Appellant.

—————————————

Appeals from the United States District Court for the District of South Carolina, at Spartanburg.  Timothy M. Cain, District Judge.  (7:17-cr-00094-TMC-4)

—————————————

Argued:  October 30, 2019               Decided:  December 16, 2019

—————————————

Before WILKINSON, MOTZ, and FLOYD Circuit Judges.

―――――――――

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge Floyd joined.

―――――――――

**ARGUED:** Howard W. Anderson III, LAW OFFICE OF HOWARD W. ANDERSON III, LLC, Pendleton, South Carolina, for Appellants. Kathleen Michelle Stoughton, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** C. Carlyle Steele, LAW OFFICE OF C. CARLYLE STEELE, Greenville, South Carolina, for Appellant Sok Bun. Sherri A. Lydon, United States Attorney, Brook Bowers Andrews, Assistant United States Attorney, Robert Frank Daley, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

―――――――――

WILKINSON, Circuit Judge:

This case arises from the prosecution of two state inmates who were federally indicted for coordinating a methamphetamine distribution ring from prison. The overarching prosecution spanned three separate indictments; ensnared 15 other co-conspirators; and spawned some 50,000 pages of discovery. At the end of it, James Peterson and Sok Bun were tried together and found guilty. On appeal, they raise numerous claims, some jointly and others individually. One claim rises above the rest: They argue that the district court should have dismissed their initial indictment with prejudice because they were improperly transferred from federal to state custody in violation of the Interstate Agreement on Detainers Act (IADA). We disagree. The district court did not abuse its discretion in dismissing the indictment without prejudice, having carefully weighed the relevant set of non-exclusive factors set out in the IADA. Finding defendants' remaining five claims without merit, we affirm the district court's judgment.

I.

On September 14, 2016, Peterson and Bun, already inmates in the South Carolina Department of Corrections (SCDC), were indicted on a series of federal offenses for participating in a methamphetamine trafficking conspiracy while they were in prison. On September 25-29, 2017, the two were tried in connection with their involvement in this scheme. In those intervening twelve months, a litany of motions and procedural wrinkles bogged down the prosecution's pace, the details of which the parties continue to debate. For purposes of this appeal, there are three key points to follow.

First, the parties disagreed extensively over where Peterson and Bun should have

3

been held, consistent with federal law, in the leadup to their federal trial. Recall that defendants were indicted when they were already serving sentences in South Carolina state prison. This is important because the Interstate Agreement on Detainers Act generally requires an indicting jurisdiction (here, the federal government) to retain custody, once a detainer is filed, of a prisoner until disposing of his charges. 18 U.S.C. app. 2, § 2, art. IV(e). This dictate is often referred to as the IADA's "anti-shuttling" provision. And here, on two occasions in November 2016, at least one defendant was transferred from federal custody to state detention facilities. *See* J.A. 274, 338. In particular, on November 30, 2016, Peterson was transferred from federal to state custody under circumstances that, as all parties now agree, were in violation of the IADA's anti-shuttling provision. *See* J.A. 331.

In December 2016, defendants tried to have the charges against them dismissed with prejudice on the ground that the government violated the IADA by improperly transferring them from federal to state custody. They argued that the federal government had regularly violated the IADA in the District of South Carolina and that its conduct here was particularly egregious because it purportedly contravened a magistrate judge's order directing Peterson to be held in federal custody until the end of proceedings. The United States moved to dismiss the indictment against both Peterson and Bun without prejudice. For reasons explained below, the district court decided that the IADA was violated only with respect to one defendant (Peterson), but dismissed without prejudice as to both. J.A. 338.

Second, there were a series of disputes over whether defendants were indicted properly and in a timely fashion. As noted, defendants were initially indicted in September

4

2016. Two other indictments followed. After the district court dismissed the charges against Peterson and Bun without prejudice under the IADA in January 2017, the government re-indicted defendants on the same charges on February 15, 2017. They were formally arrested on February 24, 2017. Then, on June 13, 2017, a grand jury returned a superseding indictment that added two new co-defendants but alleged the same substantive charges.

Defendants attempted to dismiss each of these indictments. They argued that the reindictment should be dismissed because the federal government violated the IADA's requirement that defendants be brought to trial within 120 days of being transferred to federal custody once a detainer is filed. In addition, they claimed that the superseding indictment should be dismissed because it was filed too late under the Speedy Trial Act (STA). For reasons discussed below, the district court rejected both these claims in June and July 2017. Before trial, the court also granted three continuances, two of them over the objection of defendants.

Third, there were a few issues relating to the trial itself. As noted, defendants were eventually tried starting on September 25, 2017. After a four-day jury trial, Peterson and Bun were found guilty of all offenses. The district court sentenced Peterson to 330 months imprisonment and 5 years of supervised release, consecutive to the thirty-five year state sentence he was serving. Bun was sentenced to 360 months imprisonment and 5 years of supervised release, also consecutive to his state sentence of life in prison. Peterson alone challenges several evidentiary rulings made by the trial court.

We address the joint claims first—that is, the claims involving the IADA's anti-

shuttling provision, the Speedy Trial Act, and the IADA's speedy trial rights—and then turn to the individual claims—that is, Peterson's various evidentiary arguments.

II.

Peterson and Bun's primary challenge is to the district court's decision to dismiss the initial indictment without prejudice under Section 9(1) of the Interstate Agreement on Detainers Act. 18 U.S.C. app. 2, § 9(1). None of the parties contest that the government violated the IADA on November 30, 2016 when it transferred Peterson from federal custody to state prison after a pretrial hearing in federal court. *See* J.A. 331. The issue here is whether the district court abused its discretion in choosing, as provided for under the statute, to dismiss the indictment without rather than with prejudice. We conclude that it did not.

A.

The federal government and most states—South Carolina included—are signatories to the IADA, which sets out procedures by which one jurisdiction can resolve its charges against a prisoner in another jurisdiction's custody. *New York v. Hill*, 528 U.S. 110, 111 (2000). In broad strokes, this compact aims to remove uncertainties surrounding out-of-jurisdiction charges against a prisoner, and to prevent interruptions to programs of treatment and rehabilitation. 18 U.S.C. app. 2, § 2, art. I.

Two main provisions of the IADA work in tandem to accomplish these goals. Article III provides prisoners with certain speedy trial rights. Packaged with these guarantees are the protections of Article IV, which include the anti-shuttling provision. Under that section, as noted, the indicting jurisdiction must retain custody of a prisoner and

6

dispose of his charges before transferring him back to the sending jurisdiction. 18 U.S.C. app. 2, § 2, art. IV(e). Articles III and IV are both set in motion when the indicting jurisdiction files a detainer and the prisoner is sent to that jurisdiction. *United States v. Mauro*, 436 U.S. 340, 343-44 (1978).

Ordinarily, a violation of the anti-shuttling provision visits strict consequences—a dismissal of the indictment *with* prejudice. 18 U.S.C. app. 2, § 2, art. IV(e). But Congress carved out an exception to this general rule for when the United States is the jurisdiction receiving a prisoner. 18 U.S.C. app. 2, § 9(1). In this circumstance, the statute empowers the district court to decide whether dismissal with or without prejudice is appropriate, after considering a non-exclusive list of statutory factors. These are (1) "the seriousness of the offense"; (2) "the facts and circumstances of the case which led to the dismissal"; and (3) "the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice." *Id.*

This court has not yet adopted a standard of review for Section 9 dismissals. But the right choice naturally flows from the principle that "whenever possible, the interpretation of the [IADA and the STA] should not be discordant." *United States v. Odom*, 674 F.2d 228, 281-32 (4th Cir. 1982). Because the IADA has a dismissal clause nearly identical to that of the STA, 18 U.S.C. § 3162(a), and because we review a district court's decision to dismiss an indictment under the STA for abuse of discretion, *United States v. Jones*, 887 F.2d 492, 494 (4th Cir. 1989), we now hold the same standard applies in the IADA context. The decisions of our sister circuits are in accord. *See United States v. Kelley*, 402 F.3d 39, 41 (1st Cir. 2005); *United States v. McKinney*, 395 F.3d 837, 840 (8th Cir. 2005); *United*

7

*States v. Kurt*, 945 F.2d 248, 252 (9th Cir. 1991).

B.

We ask first whether the district court abused its discretion in electing to dismiss Peterson and Bun's initial indictment without prejudice. We hold it did not. To be clear, the federal government only violated the IADA with respect to Peterson. The district court ultimately dismissed Bun's indictment as a matter of grace, not of right, "to resolve any uncertainty regarding the application of the IADA and the defendants' status." J.A. 338. Because we uphold the district court's decision as to Peterson, the same holds for Bun.[1]

In a nutshell, Peterson argues the district court applied the IADA's statutory factors incorrectly. The district court held that all three cut against him. Peterson argues that two do not—the "facts and circumstances of the case which led to the dismissal" and the impact of re-prosecution on the administration of the IADA and the administration of justice. 18 U.S.C. app. 2, § 9(1). As to the first, according to Peterson, the surrounding facts supported a dismissal *with* prejudice because Peterson requested to stay in federal custody; his transfer to state custody violated a magistrate judge's order; and the District of South Carolina has systematically violated the IADA for twenty-plus years. As to the second, Peterson insists that federal prosecution on these charges would not further the administration of justice because he will still be in jail until 2040 for his state convictions

---

[1] Unlike Peterson, Bun was transferred only once from federal to state custody in November 2016 following defendants' initial arraignment. The district court held that this transfer did not violate the IADA because Peterson and Bun's detainers were not lodged until after the transfer. J.A. 338. Accordingly, the IADA violation underlying this first claim stems only from Peterson's second transfer.

and South Carolina can still bring state drug charges. Crediting these factors in his favor, Peterson contends, reveals that the district court abused its discretion when it dismissed the indictment without prejudice.

That is a tall order because the decision to dismiss with or without prejudice is committed to the trial court's discretion twice over. First, the IADA leaves it up to the district court to decide where each factor falls, and also what additional factors are appropriate to consider beyond the statute's non-exhaustive list. 18 U.S.C. app. 2, § 9(1). Second, the weighing of these factors collectively is also committed to the district court's discretion. *See United States v. Taylor*, 487 U.S. 326, 337 (1988) ("[W]hen the statutory factors are properly considered, and supporting factual findings are not clearly in error, the district court's judgment of how opposing considerations balance should not lightly be disturbed."). In short, the district court exercises discretion atop discretion in deciding whether to dismiss a case with prejudice. And we find no fault with the exercise of that discretion here.

To start, all parties do not dispute that at least one factor—the seriousness of the offense—cuts against a dismissal with prejudice. Courts have taken a "broad view" of this factor, examining the nature of the charged conduct and the potential sentence, which would necessarily include a defendant's prior criminal history. *United States v. Kurt*, 945 F.2d 248, 252-53 (9th Cir. 1991); *see also United States v. Ward*, Nos. 13-CR-40066-01-DDC, 14-CR-40139-01-DDC, 2015 WL 1959631, at *3-4 (D. Kan. Apr. 29, 2015) (collecting cases). Applied here, these considerations plainly show the seriousness of Peterson's offense. J.A. 333-34; *see Munez v. United States*, No. 09-3860, 2011 WL

9

221655, at *4-6 (D.N.J. Jan. 20, 2011) (holding that dismissal without prejudice is proper where prisoner participated in a crack cocaine distribution conspiracy and was likely to recidivate). Not only does Peterson face a decades-long sentence for his participation in the nationwide drug trafficking conspiracy at issue here, but he also is already serving a thirty-five year sentence for a state murder conviction (along with assault and battery with intent to kill). In short, as the district court noted, the first factor supports dismissal without prejudice because Peterson remains "a potential threat to public safety." J.A. 334.

The second factor—the surrounding facts and circumstances—also weighs in favor of dismissal without prejudice. As the district court recognized, federal marshals have systematically violated the IADA in the District of South Carolina. J.A. 335, 337.[2] In this instance, however, the fact remains that Peterson was shuttled to accommodate his own preferences. As the trial court explained, "Peterson's subsequent transfer to [Perry Correctional Institution (a state prison)] was the result of the efforts by the magistrate judge and [the United States Marshals Service (USMS)] to accommodate his counsel's request that he be housed locally to facilitate attorney-client communications and counsel's desire not to travel to [Lee Correctional Institution (another state prison)]." J.A. 334. The record

---

[2] Peterson urges that in response to this pattern this court should send a "big message" by dismissing his indictment with prejudice. J.A. 335. For the reasons stated, we do not think this case presents an appropriate vehicle to overrule the district court's considered exercise of discretion on this point. To the extent however that the USMS was failing to observe the terms of the IADA, we should underscore that disregard of a federal statute is not its prerogative. At oral argument, counsel assured the court that corrective measures have been and are being taken. We trust that courts will have the occasion in the future to take notice of their implementation.

10

is emphatic on this point. *E.g.*, J.A. 260, 300, 657-58. Indeed, at several junctures Peterson's counsel indicated that placing Peterson in a state facility satisfied his client's needs. For example, in an email to court personnel, Peterson's counsel stated that USMS's proposal to transfer Peterson to a closer state facility "obviate[d] the distance concern that [he] had," and accordingly, Peterson "would not need to spend a night in a local jail" under contract with the federal government. J.A. 300.

Moreover, even though a magistrate judge ordered the government in November 2016 to hold Peterson in a local jail under contract with the federal government, the government's conduct complied with the purpose of that order. The order's goal was to house Peterson closer to counsel, which is exactly what happened when Peterson was transferred to a nearby state facility in November 2016. J.A. 331. In fact, the magistrate judge took Peterson's transfer to that facility to render his former order unnecessary. J.A. 663. Furthermore, another relevant "fact and circumstance" is that there is no indication that the government acted in "bad faith." *United States v. Brewington*, 512 F.3d 995, 998 (7th Cir. 2008) (collecting cases). Specifically, as the district court recognized, there is no evidence that USMS, the federal agency responsible for Peterson's custody, colluded with the prosecution "to gain prosecutorial advantage in the case." J.A. 335; *see also id.* (noting the absence of "intentional misconduct or deliberate indifference in regard to the IADA violations"). Together, these circumstances reasonably tilt against dismissal with prejudice.

Finally, we turn to the "administration of justice" factor. Here again Peterson comes up short. The district court properly concluded that neither of the IADA's aims would be frustrated by a without-prejudice dismissal. Peterson's transfer did not interrupt his receipt

11

of any rehabilitation services, nor was the district court's order likely to cost Peterson a fair and speedy trial. J.A. 336-37. Peterson does not contend otherwise. He instead assures us that his lengthy state sentence for prior crimes obviates the need for a federal prosecution for his more recent participation in a nationwide drug conspiracy. We are not persuaded. The district court observed, and we agree, that the federal government has a weighty interest in resolving on their merits crimes as serious as those before us; the "corrosive and devastating effects" of methamphetamine on society compel as much. J.A. 337. Plainly, this interest in merits resolutions bears upon the "administration of justice." *See, e.g.*, *United States v. Martinez*, 376 F. Supp. 2d 1168, 1176 (D.N.M. 2004).

In sum, we hold that the district court did not abuse its discretion in dismissing defendants' initial indictment without prejudice. By affording district courts substantial discretion over this determination, Congress sought to ensure that violations of the IADA's anti-shuttling provision would not needlessly encumber federal prosecutions. The district court's order preserved that aim in full.

III.

Defendants also claim that their speedy trial rights under the IADA were violated. As relevant here, the IADA provides that a prisoner must be tried within 120 days of the date he arrives in the indicting jurisdiction after the filing of a detainer. 18 U.S.C. app. 2, § 2, art. IV(c). The IADA, though, "contains tolling provisions for certain events." *United States v. Winters*, 600 F.3d 963, 970 (8th Cir. 2010) (quotation omitted). Courts can grant "reasonable continuance[s]" upon a showing of "good cause." 18 U.S.C. app. 2, § 2, art. IV(c). The IADA clock also stops "whenever and for as long as the prisoner is unable to

12

stand trial, as determined by the court having jurisdiction on the matter." *Id.* at art. VI(a).

The trial for Peterson and Bun started on September 25, 2017. While the parties disagree about when the IADA clock exactly started for defendants, everyone agrees that their trial commenced more than 120 calendar days after their detainers were filed and they arrived in federal custody. The district court held that their September 2017 trial date nonetheless complied with the IADA because the Act's clock had sufficiently tolled in the interim. Between November 2016 and September 2017, the district court granted three continuances, two of which defendants challenged, and also adjudicated a stream of motions raised by both the government and defendants. The district court held that these actions adequately tolled the IADA on the grounds that the Act's 120-day clock stopped for (1) continuances granted under the Speedy Trial Act (STA), and (2) time spent adjudicating motions filed by defendants. J.A. 117-119.

Peterson and Bun contend that both these premises constituted legal error. We review this question of law de novo. *United States v. Han*, 74 F.3d 537, 540 (4th Cir. 1996). Specifically, defendants argue that continuances granted under the STA do not automatically toll the clock for the IADA because a finding that "the ends of justice [would be] served" (as required for continuances under the STA) does not necessarily constitute "good cause" (as required for continuances under the IADA). Further, they maintain that the IADA's clock does not stop for time spent adjudicating pretrial motions. As they see it, the IADA's 120-day clock tolls under only two specific circumstances: "good cause" continuances and when a defendant is "unable" to stand trial. Holding otherwise, they caution, would undermine the purposes of the IADA's speedy trial guarantees.

13

We disagree. Defendants' position would contravene our decision in *United States v. Odom*, 674 F.2d 228 (4th Cir. 1982). While Peterson and Bun's interpretation requires that we treat the IADA as materially distinct from the STA, we explained in *Odom* that "[w]henever possible, the interpretation of the Acts should not be discordant." 674 F.3d at 231. This because "related statutes having the same purpose should be construed together." *Id.* We thus held that periods excludable under the STA should also toll the clock under the IADA where possible. *See id.*; *United States v. Hines*, 717 F.2d 1481, 1486 (4th Cir. 1983).

Accordingly, it makes perfect sense to toll the IADA's clock for continuances granted under the STA. The STA has its own 70-day speedy trial provision, which tolls during, among other periods, continuances granted as "the ends of justice" require. 18 U.S.C. § 3161(h)(7)(A). Because the IADA's "good cause" standard is not materially different from the STA's "ends of justice" standard, it follows from *Odom* that what counts for the STA should satisfy the IADA. Indeed, on this logic, every circuit court to reach the issue has agreed that periods excludable under the STA for "ends of justice" continuances should also toll the 120-day clock under the IADA's substantially similar "good cause" continuance provision. *See, e.g.*, *United States v. McKay*, 431 F.3d 1085, 1091-92 (8th Cir. 2005); *United States v. Collins*, 90 F.3d 1420, 1428 (9th Cir. 1996); United *States v. Cephas*, 937 F.2d 816, 818-19 (2d Cir. 1991).

Likewise, it follows that the IADA's clock should toll when a district court is adjudicating pretrial motions raised by the defense. *See Hines*, 717 F.2d at 1486-87. The STA's 70-day speedy trial clock tolls for the pendency of pretrial motions. 18 U.S.C.

14

§ 3161(h)(1)(D). Of a part, the IADA's 120-day clock tolls "whenever and for as long as the prisoner is unable to stand trial." 18 U.S.C. Art.VI(a). To bring this provision of the IADA into conformity with the STA, the clear majority of our sister circuits have read this tolling section "to include those periods of delays caused by the defendant's own actions." *United States v. Ellerbe*, 372 F.3d 462, 468 (D.C. Cir. 2004) (collecting cases from First, Second, Seventh, and Ninth Circuits). *But see Birdwell v. Skeen*, 983 F.2d 1332, 1340-41 (5th Cir. 1993). In particular, these courts have held that a defendant's own actions include "periods of delay occasioned by . . . motions filed on behalf of [a] defendant." *United States v. Nesbitt*, 852 F.2d 1502, 1516 (7th Cir. 1988). We agree with this interpretation of the IADA's "unable to stand trial" tolling provision. Not only does it harmonize the IADA with the STA, as our precedent in *Odom* requires, but it also avoids creating an incentive for defendants to saddle district courts with innumerable pretrial motions in hopes of manufacturing delays and waiting out the IADA's 120-day clock.

While the tolling provisions of the STA and IADA may have slightly different wordings, their time clocks have broadly harmonious aims, and courts have treated the two *in pari materia*. To that end, while the government and defendants disagree about some of the particulars of the district court's tolling analysis, what is clear is that if both continuances granted under the STA and time spent adjudicating a defendant's pretrial motions stop the IADA's 120-day clock, then Peterson and Bun's trial date complied with the statute. Because we hold that they do, we affirm the district court's judgment on this score.

15

IV.

Next, we turn to defendants' argument that the superseding indictment should have been dismissed because it was filed too late to comply with the Speedy Trial Act.

The STA requires that "any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). As earlier noted, the defendants' initial indictment was dismissed without prejudice. Defendants were re-indicted on February 15, 2017 and arrested on February 24, 2017. J.A. 13, 39-47. But the grand jury delivered a superseding indictment on June 13, 2017, which added additional defendants. J.A. 91-99. And while the superseding indictment involved the same charges as the reindictment, it obviously came more than thirty days after the February arrest.

The issue here is thus relatively straightforward: Does the STA require all indictments to be filed within thirty days following an arrest or summons or, as the district court held, is Section 3161(b) satisfied so long as the original indictment is submitted within that time frame? Because the district court's interpretation of the STA is a question of law, we review it de novo. *United States v. Cherry*, 720 F.3d 161, 165 (4th Cir. 2013).

According to Peterson and Bun, the plain text of the STA compels an all-indictments-in-thirty-days reading. On their telling, "any indictment" means "any indictment," and the government is accordingly barred from filing any new or superseding indictments after the thirty-day window has passed. By contrast, the government contends that this reading is overly literalistic, and that the structure and substance of the STA show

16

that the thirty-day window is concerned only with the original indictment to which superseding indictments are no more than a sequel or modification. Put otherwise, the point of the STA is to force the government to charge someone within thirty days of an arrest or summons, not to set those charges in stone.

To start, every federal court to have addressed the question has concluded that a "superseding indictment filed more than thirty days after arrest . . . does not violate section 3161(b) so long as the original indictment was filed within the required thirty day time frame." *United States v. Walker*, 545 F.3d 1081, 1086 (D.C. Cir. 2008). By our count, eight circuits have considered this issue and eight circuits have agreed on the result.[3] Peterson and Bun nonetheless insist that those courts have simply failed to give the word "any" its natural meaning.

The structure of the STA militates against defendants' interpretation. In statutory interpretation, context matters. *Graham County Soil and Water Conservation Dist. v. United States*, 559 U.S. 280, 290 (2010). And here, the core remedial provision of the STA indicates that the phrase "any indictment" is best read as concerning only the original indictment. Section 3162(a)(1) reads:

> If, in the case of any individual against whom a complaint is filed charging such individual with an offense, *no indictment or information* is filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter,

---

[3] *Accord Walker*, 545 F.3d at 1086; *United States v. Hemmings*, 258 F.3d 587, 591-92 (7th Cir. 2001); *United States v. Berry*, 90 F.3d 148, 151 (6th Cir. 1996); *United States v. Mosquera*, 95 F.3d 1012, 1013 (11th Cir. 1996); *United States v. Orbino*, 981 F.2d 1035, 1037 (9th Cir. 1992); *United States v. Castellano*, 848 F.2d 63, 65 (5th Cir. 1988); *United States v. Mitchell*, 723 F.2d 1040, 1044-45 (1st Cir. 1983); *United States v. Rabb*, 680 F.2d 294, 297 (3d Cir. 1982).

17

such charge against that individual contained in such complaint shall be dismissed or otherwise dropped.

18 U.S.C. § 3162(a)(1) (emphasis added). Under this section, the dismissal remedy requested by Peterson and Bun is invoked when "*no* indictment" is "filed within the time limit required by section 3161(b)." *Id.* (emphasis added); *see also Hemmings*, 258 F.3d at 592. If we take Section 3161(b) as referring only to the original indictment, then these provisions work cleanly in conjunction. But if we adopted defendants' interpretation, there would be a problem. That is, in order to dismiss a superseding indictment as untimely, we would have to hold that there was "no indictment" within the thirty-day window—put otherwise, we would have to maintain that the original indictment never happened. We see no reason to embrace this illogical reading when a coherent interpretation is readily available.

On a related front, defendants' reading of Section 3161(b) is also in tension with the substance of the STA. At bottom, their view requires the STA to "guarantee that an arrested individual indicted within thirty days of his arrest must, in that thirty-day period, be indicted for every crime known to the government." *Hemmings*, 258 F.3d at 592 (quoting *Mosquera*, 95 F.3d at 1013). This interpretation would force prosecutors to take a kitchen sink approach to indictments, lest they lose the ability to bring otherwise viable charges against a defendant in the future. We decline to adopt a reading that would spur over-charging defendants at the outset in order to preserve the government's options down the road.

In short, we join every federal court to address the question and hold that a

18

superseding indictment filed more than thirty days after an arrest does not violate Section 3161(b) so long as the original indictment was filed within the STA's thirty-day window.

V.

Having found each of defendants' joint claims unpersuasive, we turn our attention to the individual issues raised by Peterson. Speaking for himself, Peterson faults the district court for erring on a number of evidentiary issues at trial, which we review under an abuse-of-discretion standard. *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011).

Peterson claims initially that the district court abused its discretion when it forbade counsel from demonstrating to the jury that text message screenshots can readily be fabricated. At trial, the prosecution introduced a number of screenshots that documented text messages between undercover government agents and a phone number identified as belonging to Peterson. These exchanges culminated in an undercover buy of methamphetamine. At the time, Peterson did not object to the messages' authenticity, nor did he question their accuracy during cross-examination of the two government agents who testified as to the screenshots. Instead, two days after these witnesses testified, Peterson's counsel requested permission to demonstrate for the jury with his own iPhone how to falsify text message exchanges by either changing the contact information that comes up for a specific phone number, or using a publicly available website for creating fake text message screenshots. The district court denied the request.

The district court clearly did not abuse its discretion in doing so. *See* F.R.E. 403 (A "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice."). The attempted demonstration had

19

virtually no probative value. Peterson offered no evidence to suggest that the screenshots submitted at trial were fabricated. Indeed, as the district court recognized, he did not even show that his lawyer's iPhone was the same make or model as any of the relevant phones used by the witnesses in this case. J.A. 1707; *see also United States v. Williams*, 461 F.3d 441, 446 (4th Cir. 2006) ("A courtroom demonstration that purports to recreate events at issue is relevant if performed under conditions that are substantially similar to the actual events.") (internal quotation omitted). Taken for what it is, Peterson's proposed demonstration was an attempt to prejudice the jury—an attempt to confuse it by throwing the veracity of text message screenshots *writ large* into doubt, without any effort to identify a connection to Peterson's case.

The same holds with respect to Peterson's next contention. Peterson argues that the district court abused its discretion when it prohibited him from telling the jury about his lengthy state sentence. In essence, Peterson wanted to make the case that he had no financial motive to deal methamphetamine because he was going to be in jail for the next thirty-plus years anyway. According to the district court, though, the earlier state sentence had little probative value to the charged federal crimes. The court also found that this collateral information would be highly prejudicial, both because it could confuse the jury and also encourage it to acquit Peterson on the ground that he was already serving a lengthy jail sentence for state offenses. J.A. 157; *see also United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996). The district court's decision to exclude the evidence fully reflected the sentence's low probative value and its self-evident invitation to jury nullification.

Finally we address Peterson's argument that the district court abused its discretion

in excluding certain evidence that he wanted to use to impeach his co-conspirator. At trial, the jury heard testimony from a cooperating co-conspirator who recalled statements made by Bun that implicated Peterson in the drug trafficking ring. J.A. 1618-19. To discredit Bun, Peterson wanted to tell the jury about Bun's felony convictions and his ongoing life sentence. The district court decided to forbid testimony about both Bun's conviction and his sentence. It reached this conclusion after referencing Rule 403 and balancing the impeachment value to Peterson against the danger of unfair prejudice to Bun who was also standing trial. J.A. 1862-64. The court also noted that the "interest of . . . the Government" in avoiding jury nullification supported keeping the evidence out. *See id.* at 1863.

Peterson urges us to reverse this decision because the district court applied the wrong test. Namely, the district court used Rule 403's balancing test rather than the relevant test in Rule 609. The latter rule governs the use of criminal convictions for purposes of impeachment and sets out two different standards depending on the identity of the witness to be impeached. The trial judge must allow non-party witnesses to be impeached with their prior felony convictions, subject to the ordinary Rule 403 backstop. F.R.E. 609(a)(1)(A). Where a criminal defendant is the witness to be impeached, the trial judge must admit his prior felony conviction "if the probative value of the evidence outweighs its prejudicial effect *to that defendant*." F.R.E. 609(a)(1)(B) (emphasis added). Because the district court mistakenly believed the Rule 403-type analysis to govern, Peterson argues, it erroneously gave weight to an irrelevant factor—the government's interest—and therefore abused its discretion.

Even if true, this mistake does not negate what was a reasoned decision by the

21

district court to exclude the evidence. Looking to the substance of the matter, it is plain that the district court reached a result consistent with Rule 609(a)(1)(B). *See, e.g.*, J.A. 1862-64 ("I have to balance the interest of Mr. Peterson in having that information provided to the jury against the interest of Mr. Bun and avoiding prejudice to him."). The court reasoned that the probative value of Bun's felony conviction as impeachment evidence was slight, while its potential prejudice to Bun was substantial. As to the former, Bun's incarcerated status was already on full display before the jury because he chose to wear his jumpsuit to trial. As to the latter, the prejudicial impact to Bun of his prior conviction was apparent; in fact, Bun objected no less than five times to having this information before the jury. Relatedly, because the court properly excluded Bun's conviction, it follows that it was also well within its discretion to exclude his corresponding sentence.

One final point bears mention. The assignments of error all relate to evidentiary rulings in the course of conducting a trial, and the district judge was well within its discretion to rule as it quite reasonably did. *Even if* the district court erred on any or all of these matters, the result here would be the same because the aggregate effect of the errors would be harmless. *See United States v. Burfoot*, 899 F.3d 326, 340-41 (4th Cir. 2018). The jury had overwhelming evidence of Peterson's guilt. It heard, among other things, from a confidential informant, a cooperating co-conspirator, and several government agents linking Peterson to the criminal scheme. The jury also saw phone records between Peterson and the informant that led to an undercover buy of methamphetamine, as well as a series of text message screenshots pertaining to the same buy. Against this weight of evidence, we cannot say that any of these alleged evidentiary errors, taken alone or together, could

22

have "substantially swayed" the jury's decision to convict. *Id.* at 340 (quotation omitted).

The judgment of the district court is accordingly

AFFIRMED.