**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4306**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

MANUEL DE JESUS GORDILLO-ESCANDON,

        Defendant – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Greenville.  Bruce H. Hendricks, District Judge; Joseph F. Anderson, Jr., Senior District Judge.  (6:17-cr-00206-JFA-3)

Submitted:  September 11, 2020           Decided:  October 14, 2020
          Amended:  October 19, 2020

Before WILKINSON and MOTZ, Circuit Judges, and Kenneth D. BELL, United States District Judge for the Western District of North Carolina, sitting by designation.

Affirmed by unpublished opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge Bell joined.

Howard W. Anderson III, LAW OFFICE OF HOWARD W. ANDERSON III, LLC, Pendleton, South Carolina, for Appellant.  Sherri A. Lydon, United States Attorney, Columbia, South Carolina, D. Josev Brewer, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

In this case, the defendant-appellant, Manuel de Jesús Gordillo-Escandón, was indicted for conspiracy, possession of methamphetamine, and possession of a handgun in furtherance of drug trafficking. After a two-day trial, the jury convicted him on all three counts.[*] On appeal, he raises several claims, which we discuss herein. For the reasons that follow, we affirm the judgment of the district court.

I.

In December 2016, federal agents found the defendant in a Greenville County, South Carolina, hotel room with approximately 140 grams of methamphetamine, a meth pipe, and two Glock G-19 9mm handguns. In January 2017, he was indicted in state court for (1) knowingly bringing methamphetamine into the state and (2) possessing a firearm during narcotics trafficking. In June 2017, he pled guilty to two lesser-included offenses of the state counts and was sentenced to three years in prison.

On March 14, 2017, Gordillo-Escandón was indicted in the District of South Carolina for conspiracy to possess methamphetamine with intent to distribute, 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), 846, possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii), and possession of a handgun in furtherance of drug trafficking, 18 U.S.C. 924(c)(1)(A)(i). His original trial date was June 22, 2017. After

---

[*] Judge Anderson presided at trial, and Judge Hendricks presided over pretrial motions.

3

several motions, continuances, and an interlocutory appeal, *voir dire* began on February 8, 2018.

At trial, the government presented evidence as to the state of the hotel room and the location of the weapons, elicited the testimony of one of Gordillo-Escandón's co-conspirators, and put a federal agent on the stand as an expert witness in drug trafficking and firearm use. The pistols were entered into evidence. The co-conspirator testified that he had met Gordillo-Escandón to deliver methamphetamine and was out selling their methamphetamine when he was caught by police, to whom he revealed the hotel room. The Homeland Security Investigations (HSI) agent, Paul Criswell, testified that drug traffickers carry firearms for "[p]rotection for themselves, [and] protection for the product that is in their possession." J.A. 466.

The jury returned a guilty verdict on all three counts. The district court sentenced Gordillo-Escandón to the statutory minimum: 60 months as to the drug counts, to run concurrently, and 60 months as to the firearms count, to run consecutively to the drug counts. The 120-month sentence runs concurrently with the defendant's state court sentence. Following sentencing, the defendant timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

The defendant's initial challenge is to the district court's decision not to dismiss the indictment under the Speedy Trial Act (STA), 18 U.S.C. §§ 3161–74, for failure to bring him to trial within seventy non-excludable days of his initial appearance in federal court. Gordillo-Escandón's trial began 315 days after his initial appearance, but the parties

4

disagree as to how many days are properly excluded. We review the district court's factual findings for clear error and its legal interpretations of the STA *de novo*. *See United States v. Henry*, 538 F.3d 300, 303 (4th Cir. 2008). We conclude that, after accounting for excludable days, the defendant's trial occurred within the time limits imposed by the STA.

A.

The STA generally requires a defendant's trial to "commence within seventy days . . . from the date the defendant has appeared before a judicial officer of the court in which such charge is pending." 18 U.S.C. § 3161(c)(1). As the Supreme Court has explained, the STA exists to protect both "a defendant's right to a speedy trial" and "the public interest." *Zedner v. United States*, 547 U.S. 489, 501 (2006). In doing so, however, the statute does not create an uncompromising mandate; rather, it is flexible in "recogni[tion] that criminal cases vary widely and that there are valid reasons for greater delay in particular cases." *Id.* at 497. To that end, the STA provides a list of delays for which time is excluded from the seventy-day clock. *See* § 3161(h).

In this case, there were excludable delays that fall under four provisions. First, there was a "delay resulting from [an] interlocutory appeal." § 3161(h)(1)(C). Second, there were delays "resulting from . . . pretrial motion[s], from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." § 3161(h)(1)(D). Third, there was "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." § 3161(h)(1)(H). Last, there was delay for which "the judge granted [a] continuance on the basis of his findings that the ends of justice served by taking

5

such action outweigh[ed] the best interest of the public and the defendant in a speedy trial." § 3161(h)(7)(A). Accounting for delays under these provisions, we find at a minimum 245 of the 315 days between first appearance and trial excludable.

B.

The defendant's chief contention is with one of the ends-of-justice continuances that excluded sixteen days. At a January 19, 2018, hearing, the government requested a continuance and an exclusion of time based on the ends of justice from that day until jury selection began on February 8, 2018. *See* J.A. 183–84. The government requested the delay so that (1) the defendant could speak with law enforcement, (2) the government could prepare for trial, and (3) the government could evaluate the defendant's statements. *See* J.A. 184. The defendant objected to the exclusion of time. *See* J.A. 184. The district court granted the motion and found "that by granting this continuance the ends of justice outweigh[ed] the best interests of the public and the defendant in a speedy trial." J.A. 185.

The STA sets forth both procedural and substantive requirements for ends-of-justice continuances. *See* § 3161(h)(7). Subsection (A) requires that the district court must "set[] forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." And subsection (B) provides appropriate considerations for the district court when deciding whether to grant the continuance.

There can be no doubt that the substantive requirements of section 3161(h)(7)(B) were satisfied. One factor the statute provides is "[w]hether the failure to grant such a continuance . . . would deny counsel for the defendant or the attorney for the Government

6

the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." § 3161(h)(7)(B)(iv).  The government provided three reasons all connected to legitimate trial preparation.  And there is no evidence that the Assistant U.S. Attorney was not acting with due diligence.  Although almost a year had passed since the initial indictment, much of that time was occupied with the defendant's interlocutory appeal.  Thus, with the trial finally approaching, it was not unreasonable for the government attorney to need time to reacquaint himself with the case, have law enforcement meet with the defendant, and prepare.

The defendant's more compelling argument is that the district court failed to meet the STA's procedural requirements for an ends-of-justice continuance because the district court did not put its reasons for granting the continuance on the record.  The Supreme Court has made clear that "the Act requires express findings" and "does not permit those findings to be made on remand."  *Zedner*, 547 U.S. at 506.  The *Zedner* Court did provide some flexibility and allowed district courts to put findings on the record either at the grant of the continuance or at the "rul[ing] on a defendant's motion to dismiss under § 3162(a)(2)."  *Id.* at 507.  But *Zedner* also forbade any harmless error review of a "[d]istrict [c]ourt's failure to make the proscribed findings" because such an approach was "hard to square with the Act's categorical terms."  *Id.* at 508.

In this case, the district court's explanation, to put it gently, was not ideal.  The court should have taken more care with the request for the continuance.  The STA does not require elaborate findings that occupy interminable pages of transcript, but those findings should generally be more than what the district court set forth here—a mere incantation of

7

the words of the statute.  That being said, the reasons the district court found that the ends of justice were served by the continuance were also crystal clear from the context.  The colloquy between the government attorney and the court shows that this continuance was granted so that the defendant could "talk with law enforcement," and the government could "gather[] its materials for trial and . . . evaluate Mr. Gordillo-Escandón's statements."  J.A. 184.  The grant of the continuance followed right on the heels of this colloquy; the hearing leaves no room for guess work.  Not only are the reasons and justifications for the continuance quite clear, they also, as discussed *supra*, find explicit recognition in the statute.  *See* § 3161(h)(7)(B)(iv) (allowing consideration of "[w]hether the failure to grant such a continuance . . . would deny . . . the attorney for the Government the reasonable time necessary for effective preparation").  Thus, the grant of the ends-of-justice continuance viewed in the context of the hearing meets the STA's procedural requirements, and the days between January 19 and February 8 are excluded.

One other claim merits discussion.  On May 15, 2017, the government filed a motion for reciprocal discovery, for which six days are excludable.  The defendant contends that no time, or a maximum of one day, is excludable pursuant to this filing because it is not actually a motion, whereas the government argues that this filing tolls the STA clock until trial because it was a motion that was never answered or acted upon.  Both are incorrect.  The filing was a motion because it requested direction on behalf of one party as to the other from the court.  *See Melendez v. United States*, 518 U.S. 120, 126 (1996) (explaining that a motion is "[a]n application made to a court or judge for purpose of obtaining a rule or order directing some act to be done in favor of the applicant" (quoting *Black's Law*

8

*Dictionary* 1013 (6th ed. 1990))). The motion does not toll the STA clock until trial because "motions that require no hearing"—such as this one—cannot toll the clock for more than thirty days. *Henderson v. United States*, 476 U.S. 321, 329 (1986) (citing 18 U.S.C. § 3161(h)(1)(H)); *see also United States v. Sutter*, 340 F.3d 1022, 1031 (9th Cir. 2003) (holding that "a *pro forma* discovery motion" cannot be continued or under advisement indefinitely). Since *Henderson* said that for "motions [that] are so simple or routine that they do not require a hearing, necessary advisement time should be considerably less than 30 days," six days are appropriately excluded in this case. 476 U.S. at 329 (quoting S. Rep. No. 96-212, at 34).

We find no merit in the remaining assignments of error. It is always helpful, moreover, to take a step back. The great majority of the delays in this case were not attributable to the court, nor were they attributable to the government. The delays resulted in significant measure from the flurry of motions filed by the defendant and the defendant's interlocutory appeal. It was counsel's right to file those motions and to take the appeal, and it was of course his duty to defend his client vigorously. He has failed, however, to persuade us that the seventy-day limit of non-excludable time between Gordillo-Escandón's initial appearance and the beginning of his trial was exceeded. There is thus no Speedy Trial Act violation in his case.

III.

The defendant also claims that his speedy trial rights under the Interstate Agreement on Detainers Act (IADA) were violated. In the relevant part, the IADA requires that "trial . . . be commenced within one hundred and twenty days of the arrival of the prisoner in the

9

receiving State." 18 U.S.C. app. 2, § 2 art. IV(c). Like the STA, the IADA does not hold an iron-like grip on trial proceedings; it too "contains tolling provisions for certain events." *United States v. Peterson*, 945 F.3d 144, 153 (4th Cir. 2019) (quoting *United States v. Winters*, 600 F.3d 963, 970 (8th Cir. 2010)). "[F]or good cause shown in open court," a court "may grant any necessary or reasonable continuance." 18 U.S.C. app. 2, § 2 art. IV(c). The IADA also provides for the tolling of the clock "whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter. *Id.* at art. VI(a).

When applying the IADA, we have counseled that, though "the STA and IADA may have slightly different wordings, their time clocks have broadly harmonious aims," so the statute should be considered *in pari materia* with the STA. *Peterson*, 945 F.3d at 155; *see also United States v. Odom*, 674 F.2d 228, 231 (4th Cir. 1982) ("Whenever possible, the interpretation of the Acts should not be discordant."). Thus, the ends-of-justice continuances that toll the STA clock also toll the IADA clock "[b]ecause the IADA's 'good cause' standard is not materially different from the STA's 'ends-of-justice' standard." *Peterson*, 945 F.3d at 154. Likewise, the "unable to stand trial" provision of the IADA applies to "those periods of delays caused by the defendant's own actions." *Id.* (second quotation quoting *United States v. Ellerbe*, 372 F.3d 462, 468 (D.C. Cir. 2004)). In *Peterson*, we held that this includes periods "when a district court is adjudicating pretrial motions raised by the defense." *Id.* The same logic leads us to exclude the time necessary to resolve the defendant's interlocutory appeal—that too was delay caused by the defendant's actions.

10

Taken together, these provisions justify stopping the IADA clock for all 245 days excluded under the STA. Because this brings Gordillo-Escandón's trial date well within 120 days of his arrival in federal custody as required by the IADA, we affirm the district court's judgment on this score.

IV.

Next, the defendant argues that the district court erred by failing to ask the venire the defense's proposed questions about whether they could follow jury instructions about the presumption of innocence and the right to remain silent. District courts have broad discretion in conducting *voir dire*, so we review challenges to the choice of questions for abuse of discretion. *United States v. Robinson*, 804 F.2d 280, 283 (4th Cir. 1986).

The defendant argues that the court's failure to ask his two requested questions about the presumption of innocence and the right to remain silent constitutes an abuse of discretion. However, we have already rejected any *per se* rule that a failure to ask these kinds of questions constitutes an abuse of discretion. *See id.* at 281; *see also United States v. Jeffery*, 631 F.3d 669, 673–74 (4th Cir. 2011). Rather, the district court acts well within its discretion when it (1) instructs the jury on these points of law, *Robinson*, 804 F.2d at 281, and (2) asks generally about the venire members' ability to follow the law and the jury instructions, *Jeffery*, 631 F.3d at 672–73 & n.2.

In the instant case, the trial judge did both. During *voir dire*, the court asked the prospective jurors about whether they could "be fair and impartial to both sides" and whether they could "render [their] verdict solely on the evidence presented at trial and in the context of the law as the Judge instructs you, disregarding any ideas or beliefs that you

11

may have previously had about the law." J.A. 208. At trial, the judge instructed the jury that the defendant has a presumption of innocence, that the government is required to prove guilt beyond a reasonable doubt, and that the defendant has a right to remain silent. *See* J.A. 270–71, 279–80, 535–38.

What matters most is not a laundry list of questions, but whether the jury is instructed on the broad principles that animate our justice system. In light of "the broad deference traditionally and wisely granted trial courts in their conduct of *voir dire*," the questions asked, and instructions given, we find that the district court did not abuse its discretion. *United States v. Lancaster*, 96 F.3d 734, 741 (4th Cir. 1996) (en banc).

## V.

In this appeal, the defendant renews the same double jeopardy claim that we decided against him in his interlocutory appeal. *See United States v. Gordillo-Escandón*, 706 F. App'x 119 (4th Cir. 2017) (per curiam). He again claims that successive prosecutions for the same crime by different sovereigns violate the Fifth Amendment's Double Jeopardy Clause. We review double jeopardy claims *de novo*. *United States v. Schnittker*, 87 F.3d 77, 81 (4th Cir. 2015).

Since the parties filed their briefs in this case, the Supreme Court has definitively answered this question. In *Gamble v. United States*, the Court re-affirmed its longstanding precedent that, as separate sovereigns, a state government or the federal government "may prosecute a defendant" under its statutes even if the other government "has prosecuted him for the same conduct under" its own laws. 139 S. Ct. 1960, 1964 (2019). Thus, we follow the Supreme Court and do not disturb our prior adjudication of this claim.

12

## VI.

The defendant next contends that there was not sufficient evidence to show that he used his firearm in furtherance of a drug trafficking crime. Reviewing the sufficiency of the evidence, we uphold the jury verdict "if there is substantial evidence, taking the view most favorable to the government, to support it." *United States v. Wills*, 346 F.3d 476, 498 (4th Cir. 2003) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

The defendant argues that it is not enough for the government to show mere presence of a firearm at the scene of a drug trafficking crime in order to establish that the firearm was used "in furtherance of . . . such crime," as proscribed by 18 U.S.C. § 924(c)(1)(A). Rather, he claims that the government must prove that there is "a nexus between the guns discovered and the underlying offense." *United States v. Krouse*, 370 F.3d 965, 968 (9th Cir. 2004). Gordillo-Escandón maintains that the government failed to establish that nexus because there was no evidence that the guns were operable, that they were military-style, that he had touched the guns, or that they arrived in the hotel room in conjunction with the drugs.

We have considered this contention before. In *United States v. Lomax*, we held that "§ 924(c) requires the government to present evidence indicating that the possession of a firearm furthered, advanced, or helped forward a drug trafficking crime." 293 F.3d 701, 705 (4th Cir. 2002). We also said that "whether the firearm served such a purpose is ultimately a factual question," one for which deference is due the fact finder below. *Id.* Relevant factors for the jury to consider are "the type of drug activity that is being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen,

the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Id.* (quoting *United States v. Ceballos-Torres*, 218 F.3d 409, 414–15 (5th Cir. 2000)).

In this case, there was more than sufficient evidence introduced at trial to support the jury's conclusion that the handgun was used "in furtherance" of drug trafficking. The type of drug activity was a multi-state, multi-individual trafficking operation—wholesale distribution, not retail sales. *See* J.A. 349, 351–56, 360–61, 389–92, 463–67. Larger quantities of product equate to more money changing hands, which means a greater profit to be derived from robbing one of the parties. Thus, Gordillo-Escandón's operation is the kind that would be furthered through possession of a firearm. The weapon was found underneath the defendant's pillow—both hidden and easily accessible. *See* J.A. 291. When law enforcement arrived in the hotel room in which the defendant stayed, he was lying in bed, proximate to the handgun. *See* J.A. 288. The proximate and accessible, yet hidden, nature of the gun would allow the defendant first to assess a possible threat before revealing that he was armed and then to deploy the weapon quickly if the threat called for it. Gordillo-Escandón's weapon was a 9mm Glock handgun. *See* J.A. 322. Unlike a long gun, a handgun is well-suited to close-quarters self-defense in a drug trafficking operation. It fires accurately at short range and does not occupy much space. Finally, the methamphetamine was in the drawer of a dresser at the foot of the defendant's bed— proximate to the gun. *See* J.A. 298–99. This proximity would make the gun useful should another person try to steal the drugs.

14

Given this abundance of evidence, the defendant's contention that there was insufficient evidence to show that he possessed in the handgun in furtherance of his drug trafficking is without merit. We therefore decline to disturb the jury's verdict.

VII.

Lastly, we turn our attention to the defendant's Confrontation Clause claim. We review potential violations of the Confrontation Clause *de novo* but also subject them to harmless error review. *United States v. Mouzone*, 687 F.3d 207, 213 (4th Cir. 2012).

Gordillo-Escandón argues that HSI agent Paul Criswell's trial testimony violated the Confrontation Clause because he brought in otherwise inadmissible hearsay from his conversations with informants and cooperators. As part of his job, agent Criswell regularly interviewed drug informants and targets of drug investigations, from whom he learned how drug organizations traffic and distribute narcotics. *See* J.A. 456–58. The defendant does not question the agent's qualifications.

Criswell testified as to how drug operations are structured, what roles different individuals in an operation perform, and why those individuals carry firearms. *See* J.A. 463–67. He explained that drug traffickers carry firearms for "protection for themselves, [and] protection for the product that is in their possession." J.A. 466. He said that they keep those weapons "on their person, or . . . in close proximity to where they could access them if they needed to utilize them." J.A. 467. Criswell also testified that the most common weapons used are handguns and assault rifles, the former because they are easily concealable. J.A. 467.

15

The defendant contends that Criswell was "little more than a conduit or transmitter for testimonial hearsay, rather than . . . a true expert whose considered opinion sheds light on some specialized factual situation," which *Crawford v. Washington*, 541 U.S. 36 (2004), forbids. *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). That is incorrect. Like the experts in *Johnson*, whose testimony did not violate the Confrontation Clause, Criswell "never made direct reference to the content of [his] interviews or even stated with any particularity what [he] learned from those interviews." *Id.* Certainly, his understanding of why drug traffickers carry firearms was "the product of the accumulation of experience over many years of investigation of narcotic organizations and contacts with the informants and witnesses who operate within them." *Id.* at 635–36. But "[t]he fact that [his] expertise was in some way shaped by [his] exposure to testimonial hearsay does not mean that the Confrontation Clause was violated when [he] presented [his] independent assessments to the jury." *Id.* at 636. Importantly, there were no statements or specific evidence regarding the case against Gordillo-Escandón that formed the basis of the agent's understanding. *See United States v. Ayala*, 601 F.3d 256, 275 (4th Cir. 2010) (finding no Confrontation Clause violation for expert testimony on MS-13 "gang's general nature as a violent organization" because the testimony was "not about the defendants in particular").

Since the Confrontation Clause was not violated, we have no need to apply the harmless error analysis and do not disturb the district court's decision on this issue.

## VIII.

The defendant was given a fair trial in all respects, and there was ample evidence to support the jury's verdict. The district court's judgment is therefore affirmed.

16

*AFFIRMED*