NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3047-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RAMI A. AMER,

    Defendant-Appellant.

_____

> Argued January 18, 2022 – Decided March 31, 2022
>
> Before Judges Messano, Rose and Enright.
>
> On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 18-06-0460.
>
> Shane D. Avidan, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alison Perrone, Assistant Deputy Public Defender, of counsel; Shane D. Avidan and Harris Fischman, Designated Counsel, admitted pursuant to Rule 1:21-3(c), on the briefs).
>
> Dana R. Anton, Special Deputy Attorney General/Acting Sr. Assistant Prosecutor, argued the cause for respondent (Christine A. Hoffman, Acting Gloucester County Prosecutor, attorney; Dana R. Anton, on the brief).

The opinion of the court was delivered by

ENRIGHT, J.A.D.

Defendant Rami A. Amer appeals from his February 11, 2019 convictions stemming from a series of "smash and grab" burglaries. We affirm defendant's convictions and remand for resentencing pursuant to State v. Torres, 246 N.J. 246 (2021).

## I.

### Background

During the period between November 12, and November 21, 2016, multiple burglaries occurred in municipalities throughout Gloucester County. The modus operandi was essentially the same. The suspect smashed the glass of a storefront, entered the business, and removed cash found on the premises. Some of the burglaries were captured on surveillance footage while in progress. Although the quality of the footage neither permitted identification of the suspect nor definitive identification of the light blue minivan the suspect used when committing the offenses, some footage captured images of the hooded, masked suspect wearing gloves and using a hammer to smash the glass, and displayed a damaged hubcap on the suspect's vehicle.

On November 19 at approximately 2:30 a.m., defendant was stopped by an officer from the Harrison Township Police Department. Prior to the stop, the officer saw one of the vehicle's headlights was out, observed defendant

driving partially over the white line, and wanted to "double check[] on why [defendant] was in the area" that late at night. Defendant was driving a light blue Chrysler Town and Country minivan with Pennsylvania plates and had turned into a local shopping center. He received a ticket for the broken headlight and was permitted to leave without further incident.

The next day, officers from the same police department were asked to investigate burglaries committed at a local pet supply store and a spa. The businesses were situated in the same plaza where defendant was pulled over for the motor vehicle stop. Color surveillance footage from the pet supply store showed a light blue minivan with a broken hubcap drive past the store at around 7:10 a.m., and a masked and hooded suspect wearing gloves shatter the storefront entrance with a hammer.

The police investigated whether there were any light blue minivans in their system that matched the one used during the burglaries. Their search revealed defendant's motor vehicle stop from November 19 and that his minivan was registered to Laila Amer, defendant's wife. Accordingly, the police drove past defendant's nearby residence, and found a light blue minivan parked in his driveway. The minivan was missing part of a hubcap.

On November 21, 2016, officers in Harrison Township responded to a complaint of another burglary, this time at a local bagel shop. The owner of

3

the shop reported he received an alert shortly after 3:00 a.m. and when he went to the scene, he saw the glass front door was smashed. Surveillance footage obtained from a nearby bank captured the image of a light blue Chrysler minivan at the scene as the burglary was in progress.

That same morning, officers from the Mantua Township Police Department received a report of an erratic driver on Bridgeton Pike, the same thoroughfare where many of the burglaries had occurred. The description of the erratic driver's car purportedly matched the description of the minivan seen on surveillance video from recent burglaries. The police found the driver, later identified as defendant, in a parking lot on Bridgeton Pike. He was alone and sitting in the driver's seat; the rear passenger side hubcap on his car was broken. Defendant was removed from the vehicle and placed in a police car.

Although officers from Mantua Township stopped defendant, Detective Adam McEvoy, from the Harrison Township Police Department, joined them at the scene after learning the suspect's car might match the description of the minivan associated with burglaries in the area. Detective McEvoy spoke to defendant while defendant was seated in the police car and given his Miranda[1] rights. The detective testified at trial that defendant asked him to retrieve his wallet and phone from inside his car, and Detective McEvoy complied with the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3047-18

request. When he went to pick up defendant's items, the detective saw a red hammer inside the minivan, purportedly matching the description of the hammer used by the suspected burglar as seen on surveillance footage. He also saw a large number of loose coins inside the minivan. The detective secured the hammer and loose change. Once defendant was removed from the minivan, the police also discovered shards of glass on the soles of defendant's work boots.

Defendant was transported to the Harrison Township Police Department for a custodial interview and when he arrived, officers observed a cut on his right arm. Defendant agreed to waive his Miranda rights and speak to members of various police departments who inquired about burglaries committed in their municipalities. The interview lasted several hours, during which defendant was afforded a break. He did not confess to any of the burglaries and finally advised he was unwilling to answer more questions.

While in custody, defendant executed a consent to search form for the minivan. Additionally, his wife signed another form authorizing the search and was present for the search. During the search, the police found black gloves matching those seen on surveillance video of some of the burglaries, as well as black clothing, a flashlight, and shards of glass.

A-3047-18

Several months later, separate indictments were issued against defendant for his alleged role in the "smash and grab" burglaries, as well as related offenses; in June 2018, he was charged under a superseding indictment with seventeen counts of third-degree burglary, N.J.S.A. 2C:18-2(a)(1), five counts of third-degree theft, N.J.S.A. 2C:20-3(a), two counts of fourth-degree theft, N.J.S.A. 2C:20-3(a), two counts of fourth-degree attempted theft, N.J.S.A. 2C:5-1(a)(1), and 2C:20-3(a), and eleven counts of fourth-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1), for a total of thirty-seven counts.

II.

Pretrial Motions and the Commencement of Trial

While defendant's case in New Jersey was pending, he began serving a state prison sentence in Pennsylvania for similar offenses. He requested disposition of his charges in New Jersey under the Interstate Agreement on Detainers (IAD), N.J.S.A. 2A:159A-1 to -15; the State of New Jersey received his request by February 23, 2018.

In May 2018, the trial judge in the present matter issued a scheduling order, directing any suppression motions related to the November 2016 warrantless search be filed within two days. The judge further ordered any other motions and supporting briefs be filed no later than June 1. The defense filed two suppression motions on May 21, but its corresponding letter briefs

6                                                                    A-3047-18

were submitted after the deadline fixed by the court. One such brief was filed electronically on the day of the suppression hearing and referenced a search warrant and a canine sniff, neither of which were implicated in this matter. In any event, defendant's filings confirmed he sought suppression of the items seized from his person and his minivan, as well as statements made during his custodial interview.

On June 29, 2018, the judge proceeded with the suppression hearing. The State called one witness — the Woolwich Township police officer who conducted the search of defendant's minivan in the presence of defendant's wife and was present for a portion of defendant's custodial interview. The officer confirmed that after defendant's arrest, he was given his Miranda rights, was "very cooperative," and agreed to the search of the minivan. The officer also stated defendant's wife consented to the search.

In his closing argument, defense counsel noted that he presented the court with "twin motions of . . . Miranda and consent to search. And . . . they're intertwined[.]" Defendant's attorney did not dispute defendant was Mirandized at the commencement of his custodial interview, but contended defendant was "tired" during his interview. The judge responded to counsel's remarks, stating:

> This was a motion that you filed to challenge the search . . . that comes from the consent forms plus

A-3047-18

[defendant's] Miranda [rights] with regard to the statement. It's all right there apparently on the video but no one ever gave it to the [c]ourt. Your argument is that . . . he is so tired[,] that he is so sleepy, so groggy, so fatigued that his will is overborne and yet you don't give me the video to assess that.

Defense counsel continued his argument, stating:

[W]ith regard to the consent to search[,] we . . . have . . . [defendant] at some point as he's getting more and more tired and . . . he's signing this consent to search and he waives his right to be present at execution [of the search], of course he can withdraw his consent at any time even though he is not present.

We also have [defendant's wife]. And we hear . . . she is eager to get her car back . . . and so eager to get her car back she signs the consent to search and dutifully waits while they search . . . the vehicle.

. . . .

She doesn't do it knowing the circumstances of the situation and we don't know whether [defendant's wife] would have consented to that search . . . if she had been told something about what her husband was facing here . . . .

And so, . . . defense also asserts that that consent to search is invalid and asks that the glove and all the photographs that were taken including of loose change and all that . . . be suppressed as well.

At no time during the hearing did defense counsel contest the State's recitation of facts in its June 1, 2018 brief that Detective McEvoy seized items in plain view when defendant asked him to retrieve items from the minivan.

8

At the conclusion of the hearing, the judge rendered a decision from the bench, finding,

> with regard to the search[,] there's no question that it was a valid search. The consent came from both the defendant as well as the wife. They signed the consent forms. . . . [T]here's nothing to suggest that the defendant was . . . in such a condition that he didn't . . . understand the consent form, that he . . . was unable to sign the form [because] he was so fatigued or otherwise. He waived his right to be present.
>
> The wife signed the consent form. She did not waive her right to be present. She was present during the search. There's nothing to suggest that the consent here was invalid in any way. So the search of the van is valid based upon the consent . . . .
>
> . . . I have nothing before me to suggest that the defendant's will was overborne in any way with regard to the statement. The witness testified that the defendant was very cooperative. He did appear tired, did appear fatigued, but without the benefit of reviewing the video to determine . . . whether or not he is completely incoherent because of fatigue or otherwise . . . there's nothing present before me to suggest that the defendant was of such a condition that he was incapacitated or incapable [in] any way to make a valid waiver of his rights.
>
> . . . .
>
> So . . . his waiver of his <u>Miranda</u> rights seems to be knowing and voluntarily made . . . . So . . . the motion to suppress the statement is denied. The motion to suppress the search is denied.

9

On July 13, 2018, the judge issued a written decision, supplementing his reasons for denying the suppression motions. Preliminarily, he commented in a footnote that "[d]efense counsel filed a notice of motion for both motions to suppress. However, defense counsel has only submitted a written brief in support of the motion to suppress [d]efendant's statement to police. The State has submitted briefs in opposition to both motions."[2]

The judge found that when defendant was arrested and removed from his vehicle, he asked Detective McEvoy to enter the minivan to retrieve defendant's wallet and cell phone. Further, the judge noted that when the detective accommodated defendant's request, he inadvertently discovered a red hammer and large amounts of coins "in plain view inside the vehicle." Additionally, the judge found Detective McEvoy recognized the red hammer in defendant's car was similar to the hammer seen on surveillance videos of the "smash and grab" burglaries recently committed; the detective was aware the hammer was found in a blue minivan with a rear hubcap missing, just like the van seen on surveillance footage, and the amount of coins Detective McEvoy

---

[2] The record reflects defense counsel did not alert the judge to the late electronic filing of his June 29 letter brief, and the judge remained unaware of this filing until well after he issued his July 13 written opinion. Nonetheless, following his review of the untimely brief, the judge notified counsel that its contents did not alter the court's "position that the evidence is not suppressed and the [suppression] motion's denied."

A-3047-18

spotted was consistent with the money stolen from the cash drawers at the businesses targeted by the suspect. After highlighting the requirements for a plain view exception to the warrant requirement, under State v. Mann, 203 N.J. 328, 341 (2010), the judge found the detective properly seized the hammer and coins under that exception.

Additionally, citing State v. Johnson, 68 N.J. 349, 353-54 (1975), the judge confirmed the search of defendant's vehicle was valid under the "recognized exception to the warrant requirement" of consent. The judge found because "[d]efendant and his wife completed consent to search forms prior to the search of the vehicle[,]" defendant's wife "was present for the entire search[,]" and "consent was voluntarily given[,]" the search was lawful.

Further, the judge found "the State proved beyond a reasonable doubt that [d]efendant's decision to waive his Miranda rights was knowing and intelligent." The judge specifically rejected defendant's argument that his waiver was "not knowing and intelligent because [defendant] was sleep deprived at the time he waived his rights." Instead, the judge found "[d]efendant's conduct during the interview demonstrated . . . the alleged lack of sleep did not affect his understanding of his Miranda rights," because he was "coherent during the course of the interview and able to make informed, deliberate decisions," including the decision to "assert[] his right to terminate

11

the interrogation, which was honored." Citing State v. Nyhammer, 197 N.J. 383, 401 (2009), the judge concluded under the "totality of the circumstances[,]" including defendant's age and prior involvement with law enforcement, as well as the fact defendant "never confessed to any of the alleged crimes[,]" defendant's will was not "overborne."

Four days after he issued his supplemental suppression opinion, the judge executed a Trial Management Order, directing the parties to appear for a pretrial conference on July 23 and notifying counsel he "anticipate[d] selecting a jury" that morning "and opening thereafter." The order also stated "[c]ounsel must have witnesses available so as to utilize the entire trial day."

On July 23, the judge conferenced the matter with counsel, and jury selection was rescheduled to the next day. The judge noted jury selection would continue the following week, but the court would need to "take a break and then pick back up in September." Neither defense counsel nor the State objected to the timeframes outlined by the court. Also on July 23, defendant filed a motion in limine, asking the judge to bar the State from eliciting certain testimony during the trial.

Jury selection began on July 24, 2018. Later that day, the judge informed counsel that jury selection would continue the next day and the parties would return to court again on July 31. Because he anticipated a break

in the proceedings in August, due to his calendar obligations and vacation schedule, and defense counsel's vacation plans in early September, the judge also advised counsel they should expect to resume the case on September 13. Again, neither the State nor defense counsel objected to the dates provided by the court.

But on July 25, as jury selection continued, defense counsel informed the court that he and defendant discussed "the IAD" and defendant had expressed concern that "in August, we don't have trial." Counsel added:

> And I did go over it, you know, I understand [a] jury trial must commence within 180 days of the defendant's demand.
>
> . . . .
>
> . . . I just wanted to make a record. . . . I just note that I have availability for the month of August . . . . I have the days where this could be, I submit, accomplished in time.
>
> . . . And so, we're talking about delay – I looked at it this way, Your Honor is commencing this within 180 days, and so, that part is met. And then I thought . . . well what if a [c]ourt commenced the trial and then put it off, like six months and then didn't continue the trial . . . that would be violative and undue delay, unnecessary delay.
> [(Emphasis added).]

The assistant prosecutor countered:

> I think the IAD is very clear that trial must commence before the IAD date. We are commencing the trial,

A-3047-18

we're picking a jury as we're currently sitting. We still have another day in this month to continue . . . . The defense filed two motions, the dates between that motion being heard and the previous hearing, those should be excluded from the 180 days, which would put us well into September.

Therefore, even if we didn't . . . commence until September, we would be commencing at the proper time.

The judge responded:

[W]e commence[d] trial within 180 days and this is not the situation that . . . the defense . . . suggested . . . as a possibility for a six-month delay. The [c]ourt is commencing, getting it started. It is unavailable in August. It has a specific assignment in August that has to be achieved. The assignment is criminal justice reform where it does not permit trial days within that month.

I do have vacation in that month. We realized yesterday that the defense has a vacation in early September. . . . The case cannot be tried when there's a dispositive motion that's pending. It has to be resolved. I think we did resolve it as expeditiously as we could, so I will look at that.

But in any event, we commenced the trial within the statutory framework of the IAD . . . .

So, we have begun the trial. There is going to be a disruption. I'll look into the question of tolling and that may provide the dates in question.

. . . .

Certain motions may call upon . . . that [IAD] clock to be tolled, . . . because if they're dispositive

14

motions, the case can't be tried until they're briefed and heard. And I think both counsel have a right to be thorough in their review of the issue and brief it so the [c]ourt is well-informed in the argument . . . [a]nd we, in fact, did that.

So, I'll consider, I'll look at the issue of exclusion, but within the confines of the IAD, we've started the case, we commenced it with 180 days, and I don't see that there's an IAD violation.

Later that day, the judge asked if either attorney had any issues that needed to be addressed. The assistant prosecutor asked, "should the State be ready to open, and more importantly, have witnesses for next Tuesday [July 31], or are we just going to finish jury selection?" The judge stated:

If it were me trying the case, I would say let's get the jury picked and then we'll start openings when we return. You'll have a witness and a half, two witnesses, . . . and you'll be asking the jury to remember what they said . . . over . . . a month or so, so that would be what I'd be asking. But what do you think?

The following exchange then occurred between defense counsel, the judge, and the assistant prosecutor:

DEFENSE COUNSEL: I'm concerned about time, but what happens is there's no way that the trial finishes on Tuesday –

JUDGE: No.

DEFENSE COUNSEL: − at this point, I do concede. [D]o that. I just think – I think what that will also

15

> help is prevent, hopefully, a lot of questions about the testimony that came in . . . on Tuesday, you know?
>
> ASSISTANT PROSECUTOR: And then –
>
> DEFENSE COUNSEL: And that would extend proceedings.
>
> JUDGE: Read backs and all that kind of stuff.
>
> [(Emphasis added).]

In response to a follow-up question by the assistant prosecutor, the judge stated it was not his intention to swear in the jury once the selection process concluded because jurors could be lost over the upcoming break. In fact, he stated, "in that time period, who knows? We could have a problem with one or more [jurors]."

The following day, the judge issued a six-page opinion, confirming he understood a "prisoner must 'be brought to trial within 180 days'" of the State receiving a prisoner's request for disposition under the IAD. The judge determined "New Jersey authorities received [d]efendant's request to address his untried matter(s) in New Jersey" on February 23, 2018 and the "[t]rial commenced on July 24, 2018 with jury selection," well within the 180-day timeframe under the IAD.

Noting defendant was transported to New Jersey in March 2018 and indicted by way of a superseding indictment in June 2018, the judge also found that at one point, defendant was "unable to stand trial due to the filing and

16

pendency of [his] pretrial motions," thereby tolling the 180-day time period for disposition of his case. Further, the judge stated that a "delay attributable to disposition of motions filed by . . . defendant" constituted "good cause" for tolling under the IAD. He calculated that the 180-day period within which defendant was to be tried was tolled from May 21, when defendant's suppression motions were filed, to July 13, 2018, when they were resolved.

The parties returned to court on July 31, at which time the judge addressed defendant's pending in limine motion. The judge granted the motion, in part, and barred the State from eliciting testimony from police officers that the hammer, clothing, and boots recovered during defendant's arrest were the same items seen in surveillance footage from the burglaries. Further, the judge granted defendant's request to prohibit officers from testifying about drugs and paraphernalia found in the minivan, as well as defendant's suspected drug use.

The judge also barred officers from testifying about how defendant may have received a cut on his arm before he was arrested, and, "[a]bsent expert testimony," the State's witnesses were not permitted to testify that shards of glass found in the minivan or on defendant's boot matched the broken glass found at the businesses burglarized. Still, the judge did not preclude the State from arguing at closing that the jury could draw an inference that the hammer,

17

coins, and glass shards found in the minivan, along with the cut on defendant's arm and glass shards found in his boot, were tied to the burglaries. Moreover, the judge saw no reason to prohibit officers from testifying why, "based upon the commonality of things in different burglaries, [they] were focusing on finding a minivan, finding a hammer, [and] finding a person of [a certain] stature."

In a pro se letter to the judge dated August 28, defendant stated he was "filing a motion to dismiss all charges being held against him . . . due to a violation of his rights in regards of the [IAD]." He claimed the 180-day time limit expired "as of August 22, 2018." Nine days later, the judge entered an order, accompanied by a thirteen-page decision, denying defendant's application, noting defendant's "very issue was raised by defense counsel on July 24[] orally at the start of jury selection."[3] The judge reiterated many of the findings set forth in his July 26 opinion, and specified that the "180-day clock" was tolled for fifty-four days to account for the filing and resolution of defendant's suppression motions. By the judge's calculations, the "[t]olling of

---

[3] The September 6, 2018 order was amended to correct the date of the decision and refiled on September 17.

[fifty-four] days . . . move[d] the maximum date of August 22nd [to start the trial] to October 14th."[4]

Additionally, the judge expressed that after jury selection started on July 24, "[t]he court was unavailable to try any case in August due to its assigned duties . . . and a scheduled vacation." Further, he stated defendant's attorney "was unavailable to try the case until September 13, 2018, due to a scheduled vacation." Given "[o]pening statements [were] scheduled to commence on September 13th[,]" the judge reasoned, "[i]f you consider either July 24th or September 13th as the commencing date of trial, either is within the tolled 180-[d]ay statutory period." Therefore, the judge again found there was "no violation of the [IAD]."

On September 13, prior to opening statements, the judge informed counsel he saw no need for further argument regarding the IAD because no new issues were raised in defendant's pro se letter that had not been previously addressed. Later that day, the judge also declined to revisit his decision on the suppression motions.

After calling its first witness on September 13, the State introduced over one hundred exhibits, including surveillance footage and items seized from

---

[4] Although the time period between these two dates actually equals fifty-three days, that fact does not affect our decision.

defendant's minivan. Also, the State provided photos of the cut found on defendant's right forearm when he was arrested. Further, it produced over one dozen witnesses, including victims of the burglaries, as well as Detective McEvoy, and Harrison Township Police Officer Kevin McGowan. Both members of law enforcement testified about their respective investigations, the surveillance footage they viewed, and the damaged hubcap they found on defendant's vehicle, which was similar to that seen in the footage.

At the close of the State's case, defendant moved for a judgment of acquittal, pursuant to Rule 3:18-1. The motion was denied. Defendant elected not to testify or call any witnesses.

On October 4, 2018, the jury returned its verdict, convicting defendant of: thirteen counts of third-degree burglary; one count of third-degree theft by unlawful taking; five counts of fourth-degree theft by unlawful taking; eight counts of fourth-degree criminal mischief; and one count of fourth-degree attempted theft by unlawful taking. It acquitted defendant of four counts of burglary.[5] Subsequently, defendant was sentenced to four consecutive terms of

---

[5] The following counts were dismissed before the jury deliberated: counts two and three (involving a November 20, 2016 burglary); counts five and thirty-seven (involving burglaries on November 21, 2016); and count thirty-two (involving a November 15, 2016 burglary).

A-3047-18

imprisonment of four years each, i.e., one four-year term for each day he committed burglaries in November 2016. The judge ordered defendant's sixteen-year aggregate sentence to run consecutively to the sentence defendant was serving in Pennsylvania.

## III.

Defendant raises the following contentions for our consideration:

I.    The Indictment Should Be Dismissed With Prejudice Because [Defendant] Was Not "Brought to Trial" Within 180 Days, as Required by the Interstate Agreement on Detainers.

    A.    [Defendant] Was Not "Unable to Stand Trial" While His Pretrial Motions Were Pending.

    B.    [Defendant] Was Not "Brought to Trial" When Voir Dire Began.

II.    The Prosecution Failed to Prove Beyond a Reasonable Doubt that [Defendant] Committed the Burglaries.

    A.    The Hammer Does Not Link [Defendant] to the Crimes.

    B.    The Minivan Does Not Link [Defendant] to the Crimes.

    C.    The Other Evidence Does Not Link [Defendant] to the Crimes.

III.    [Defendant] Was Deprived of a Fair Trial by Police Officers' Lay Opinion Testimony Purporting to Identify the Hammer and Minivan in the

21

Surveillance Videos as [Defendant's] Hammer and Minivan.

IV. The Hammer and Coins Should Have Been Suppressed.

V. The Trial Was So Infected With Error That Even If Each Individual Error Does Not Require Reversal, The Aggregate Of The Errors Denied [Defendant] A Fair Trial.

VI. At a Minimum, [Defendant] Should be Resentenced.

    A. The Sentencing Court Failed to Consider Special Probation on the Erroneous Ground that [Defendant] Was Not Eligible.

    B. The Sentencing Court Failed to Explain Why the Four Consecutive Sentences Should Be of Equal Length, Which Resulted in an Excessive Sentence.

We are persuaded defendant's argument under Point II lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

As to Point IV, we affirm the denial of defendant's suppression motions for the reasons expressed by the trial judge in his oral and written opinions. To the extent defendant quarrels with the judge's determination that certain items were found by Detective McEvoy in plain view, the record reflects defendant failed to timely raise this argument before or during the suppression hearing. Further, even in his untimely June 29 brief, defendant simply asserted "[t]he items [recovered by law enforcement] were not in plain view until police

had made [d]efendant exit the vehicle.  He should have been allowed to go on his way."

"The mere allegation of a warrantless search . . . does not place material issues in dispute . . . ."  State v. Green, 346 N.J. Super. 87, 91 (App. Div. 2001).  Rule 3:5-7(b) provides that when a defendant files notice that he or she will seek to suppress evidence seized without a warrant, the State must file a motion, together with a brief and a statement of facts.  The defendant then is required to file a brief and counterstatement of facts.  R. 3:5-7(b).  "It is only when the defendant's counter[-]statement places material facts in dispute that an evidentiary hearing is required."  Green, 346 N.J. Super. at 90 (citing State v. Hewins, 166 N.J. Super. 210, 213-15 (Law. Div. 1979), aff'd, 178 N.J. Super. 360 (App. Div. 1981)).  Under these circumstances, where defendant submitted no facts contrary to those presented by the State regarding Detective McEvoy's recovery of items in plain view, we decline to conclude it was error for the judge to rule on the suppression motions and make his findings without requiring testimony from Detective McEvoy.

Additionally, because we reject defendant's individual claims of error relative to the judge's handling of the trial, we decline to reverse defendant's convictions under the cumulative error doctrine, as argued in Point V.  See

State v. Terrell, 452 N.J. Super. 226, 308 (App. Div. 2016). We address defendant's remaining contentions more fully.

## A. The IAD

Regarding Point I, defendant renews his argument that he was not brought to trial within the requisite 180-day period under the IAD and therefore, his charges should have been dismissed. We are not convinced.

"As a 'congressionally sanctioned interstate compact,' the interpretation of the IAD 'presents a question of federal law.'" State v. Pero, 370 N.J. Super. 203, 214 (App. Div. 2004) (quoting Cuyler v. Adams, 449 U.S. 433, 442 (1981)). "Questions related to statutory interpretation are legal ones" and therefore, we review those conclusions de novo. State v. S.B., 230 N.J. 62, 67 (2017).

The purpose of the IAD "is 'to encourage the expeditious and orderly disposition of such [outstanding] charges and determinations of the proper status of any and all detainers based on untried indictments, informations or complaints' and to provide 'cooperative procedures' for making such determinations." State v. Perry, 430 N.J. Super. 419, 424-25 (App. Div. 2013) (alteration in original) (quoting 18 U.S.C. app. 2, § 2, art. I; N.J.S.A. 2A:159A-1). The IAD "shall be liberally construed so as to effectuate its purposes." N.J.S.A. 2A:159A-9. Also, "whenever possible, the interpretation

24

of the [IAD] and the [Speedy Trial Act (STA)], 18 U.S.C.S. §§ 3161-74 should not be discordant."  United States v. Peterson, 945 F.3d 144, 151 (4th Cir. 2019) cert. denied, 141 U.S. 132 (2020) (quoting United States v. Odom, 674 F.2d 228, 231-32 (4th Cir. 1982)).

Under Article III of the IAD, the prosecutor is required to proceed to trial within 180 days of written notice of the defendant's current place of imprisonment and his or her request for a final disposition.  N.J.S.A. 2A:159A-3(a).  The 180-day period to bring the prisoner to trial runs from the date the appropriate written notice is actually delivered to the prosecutor.  Fex v. Michigan, 507 U.S. 43, 52 (1993); Pero, 370 N.J. Super. at 215.  If the defendant is not brought to trial within the applicable period, the indictment is subject to dismissal with prejudice.  N.J.S.A. 2A:159A-5(c).

However, the 180-day period is "not absolute."  State v. Binn, 196 N.J. Super. 102, 108 (Law Div. 1984), aff'd as modified, 208 N.J. Super. 443, 450 (App. Div. 1986).  Under Article III(a) of the IAD, "the court having jurisdiction of the matter may grant any necessary or reasonable continuance" "for good cause shown in open court, [and] the prisoner or his [or her] counsel being present[.]"  N.J.S.A. 2A:159A-3(a).  The grant of a continuance, on good cause shown, may be made "at any time prior to an actual entry of an order dismissing the indictment pursuant to Article V[.]"  State v. Lippolis,

107 N.J. Super. 137, 147 (App. Div. 1969) (Kolovsky, J.A.D., dissenting), rev'd on dissent, 55 N.J. 354 (1970).

Good cause for a continuance under the IAD is analyzed for an abuse of discretion. See State v. Buhl, 269 N.J. Super. 344, 356 (App. Div. 1994). But the IAD does not define the term "good cause." See Ghandi v. Cespedes, 390 N.J. Super. 193, 196 (App. Div. 2007) (explaining "'[g]ood cause' is an amorphous term . . . difficult of precise delineation"). Thus, "the question of whether good cause exists for a continuance must be resolved from a consideration of the totality of circumstances in the particular case, on the background of the considerations which motivated the interstate agreement, as expressed in N.J.S.[A.] 2A:159A-1." State v. Johnson, 188 N.J. Super. 416, 421 (App. Div. 1982) (quoting Lippolis, 107 N.J. Super. at 148-49 (Kolovsky, J.A.D., dissenting)).

Additionally, under Article VI(a), the 180-day period can be "tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." N.J.S.A. 2A:159A-6(a). "To bring this provision of the [IAD] into conformity with the STA, the clear majority of [federal] circuits have read this tolling section 'to include those periods of delays caused by the defendant's own actions[,]'" Peterson, 945 F.3d at 154 (quoting United States v. Ellerbe, 372 F.3d 462, 468 (D.C. Cir. 2004)),

including "periods of delay occasioned by . . . motions filed on behalf of [a] defendant[,]" id. at 155 (alterations in original) (quoting United States v. Nesbitt, 852 F.2d 1502, 1516 (7th Cir. 1988)).[6] See also New York v. Hill, 528 U.S. 110, 112 (2000) (confirming the filing of "several motions" by defense counsel "tolled the time limits [under the IAD] during their pendency").

Notably, a defendant also will be deemed to have waived rights under the IAD if defense counsel requests or agrees to a trial date beyond the relevant 180-day timeframe. Id. at 114; see also Buhl, 269 N.J. Super. at 357. Such a waiver will bar the defendant from later seeking a dismissal of the indictment on those same grounds. As noted by the Hill Court, a defendant is "deemed bound by the acts of his [or her] lawyer[,]" and "[s]cheduling matters

---

[6] We are cognizant a circuit split exists on whether pretrial defense motions render a defendant "unable to stand trial." At least six courts of appeal have found a defendant "unable to stand trial" when he or she has motions pending before the trial court. See Peterson, 945 F.3d at 154-55 (4th Cir. 2019); Ellerbe, 372 F.3d at 468-69 (D.C. Cir. 2004); United States v. Cephas, 937 F.2d 816 (2d Cir. 1991); Nesbitt, 852 F.2d at 1512-13 (7th Cir. 1988); United States v. Johnson, 953 F.2d 1167 (9th Cir. 1992); United States v. Walker, 924 F.2d 1 (1st Cir. 1991). By contrast, the Fifth and Sixth Circuits have found that "unable to stand trial" "refer[red] to a party's physical or mental ability to stand trial throughout the fifteen years prior to Congress enacting the [IAD]." See Birdwell v. Skeen, 983 F.2d 1332, 1340-41 (5th Cir. 1993); Stroble v. Anderson, 587 F.2d 830, 838 (6th Cir. 1978). The United States Supreme Court recently denied certiorari to the Fourth Circuit Court of Appeals on this discrete issue. Sok Bun v. United States, ___ U.S. ___, 141 S. Ct. 132 (2020).

27

are plainly among those for which agreement by counsel generally controls." 528 U.S. at 115. The Court reasoned that when the trial date is at issue under the IAD, "only counsel is in a position to assess the benefit or detriment of the delay to the defendant's case." Ibid.

Governed by these principles, we are convinced the judge properly denied defendant's motion to dismiss based on an IAD violation. We reach this result because defendant waived his right to start the trial within 180 days of February 23, 2018, i.e., August 22, 2018, when his attorney conceded during jury selection on July 25, 2018 that the State should not be required to present witnesses to testify on the next scheduled court day of July 31. As discussed, this waiver evolved from a dialogue between the judge and counsel about whether it would be prudent to commence testimony on July 31, given the distinct possibility jurors might not recall such testimony when trial resumed several weeks later. During the colloquy, although defendant's attorney stated he was "concerned about time," he also concluded, "there's no way that the trial finishes on Tuesday [July 31]" so "at this point, I do concede. [D]o that. I just think – I think what that will also help is prevent, hopefully, a lot of questions about the testimony that came in . . . on [July 31], you know?" (Emphasis added). This waiver in open court is fatal to defendant's contention the judge erred in rejecting his request for dismissal of the indictment.

28

Additionally, we are persuaded the judge correctly found the period between the filing of defendant's suppression motions and their resolution several weeks later tolled the time under the IAD for defendant to be brought to trial. Accordingly, we decline to disturb the judge's calculation that defendant's initial end date for being brought to trial, August 22, 2018, was extended by approximately fifty-four days to account for the time it reasonably took to resolve these motions. In short, because: the original IAD deadline was properly tolled and reset to October 14, 2018; defendant's trial commenced and concluded before October 14; the judge opted not to further toll the original deadline to account for defendant's additional motions; and there is no suggestion by defendant that the State engaged in dilatory tactics, we are satisfied the judge correctly concluded the tolling of the IAD deadline resulted in no IAD violation.

Although we need not address this issue further, for the sake of completeness, we note the judge also found there was "good cause" to extend the statutory 180-day period. As discussed, a court may grant a continuance under the IAD if "necessary or reasonable," "for good cause." Considering the judge listed, heard, and decided defendant's suppression motions within weeks of their filing, we decline to conclude the judge abused his discretion in

29

finding there was "good cause" to extend the 180-day period under the IAD due to the filing of defendant's suppression motions.[7]

## B. Lay Testimony

Regarding Point III, defendant argues his convictions should be reversed because Detective McEvoy and Officer McGowan provided improper lay testimony "to the effect that they could positively identify [defendant's] hammer and . . . minivan in the surveillance videos."  (Emphasis added). Because defendant did not object at trial to the portions of lay testimony he now challenges, we review the admission of this testimony for plain error.  R. 2:10-2.

The plain error standard aims "to provide[] a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error."  State v. Bueso, 225 N.J. 193, 203 (2016).  Indeed, "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made."  State v. Frost, 158 N.J. 76, 84 (1999). The Court has repeatedly emphasized that "rerun[ning] a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal."  State

---

[7]  Given defendant's waiver under the IAD, we also need not address his argument that he was not "brought to trial" as of the date jury selection began.

v. Singh, 245 N.J. 1, 13 (2021) (alterations in original) (quoting State v. Santamaria, 236 N.J. 390, 404-05 (2019)).

We typically defer to a trial court's evidentiary rulings absent an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). Appellate courts review the trial court's evidentiary ruling "under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)).

N.J.R.E. 701 governs the admission of lay opinion testimony.[8] "The first prong of . . . N.J.R.E. 701 requires the witness's opinion testimony to be based on the witness's 'perception,' which rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." Singh, 245 N.J. at 14 (quoting State v. McLean, 205 N.J. 438, 457 (2011)). "The second

---

[8] N.J.R.E. 701 provides:

> If a witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness'[s] perception; and
>
> (b) will assist in understanding the witness'[s] testimony or determining a fact in issue.

31

requirement of N.J.R.E. 701 is that lay-witness opinion testimony be 'limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue.'" Id. at 15 (quoting McLean, 205 N.J. at 458).

When it comes to testimony by law enforcement, "[f]act testimony has always consisted of a description of what the officer did and saw," and "an officer is permitted to set forth what he or she perceived through one or more of the senses." Ibid. (alteration in original) (quoting McLean, 205 N.J. at 460). Further, a witness is allowed to comment on something seen by the witness on a surveillance video, as long as the witness uses "neutral, purely descriptive terminology such as 'the suspect' or 'a person.'" Id. at 18. Moreover, a jury is free to credit such testimony or reject it entirely. Id. at 20.

Here, we are not persuaded Detective McEvoy or Officer McGowan violated the tenets of N.J.R.E. 701. Our review of the record reflects neither witness identified the burglary suspect seen on surveillance video as defendant; likewise, neither witness testified the minivan seen on such footage belonged to defendant.

For example, when Detective McEvoy was asked what he observed from the November 20 video depicting the burglary at a pet supply store, he stated:

> As the . . . suspect vehicle approached the front of the store and drove by slowly, we then learned that

32

> it was a Chrysler Town and Country minivan, which was light blue in color. And . . . the rear passenger side hubcap had a large piece missing out of it.
>
> . . . .
>
> The subject obviously is dressed in all black, wearing work boots, and had a two-toned hammer, which was red and black . . . . Another thing that we[] learned from that video, Patrolman McGowan, who initially responded to the scene . . . later that day went back to our station and checked our records management system and . . . was able . . . to see if any vehicles matching that description had been stopped. And . . . he learned that the evening prior to that burglary at [the pet supply store], a light blue Town and Country minivan was stopped in that same complex and issued a summons for a . . . headlight violation. And at that time of the stop, [defendant] was driving the vehicle. And at that time, we identified the vehicle.

Detective McEvoy also stated he saw "the missing piece of hubcap . . . from the right rear of the vehicle" on surveillance footage.

Thus, instead of identifying defendant as the "the subject . . . dressed in black" or stating the "suspect vehicle" he saw on the video belonged to defendant, the detective used neutral language, leaving the jury to decide if defendant was the burglar at the scene or if the "light blue Town and County minivan" with the missing piece of hubcap seen on surveillance video belonged to defendant.

33

Additionally, when Detective McEvoy testified about the footage of the burglary from the bagel store, he confirmed the footage showed "a light blue, Chrysler minivan," not "defendant's light blue, Chrysler minivan." Further, when he testified about being at the scene of defendant's arrest on November 21, he stated:

> Upon my arrival, I had already been given the description of the vehicle and the tag and I was alerted by one of our officers that the same vehicle matched the description of a previously reported burglary in Woodbury and possibly Deptford earlier that morning. So[,] . . . I now observed the vehicle parked in a marked parking spot and it ha[d] been stopped by [the] Mantua Township Police Department and they had removed him from the vehicle at that time.

> Immediately upon approaching the vehicle is when I again observed the rear passenger side hubcap had a missing portion . . . out of it and then I began conversing with the officers on scene about what they observed.

Defendant argues this portion of the detective's testimony should have been excluded, in part, because the detective referred to "again" observing the damaged hubcap on the minivan, despite it being the first time he saw defendant's minivan in person. While we understand defendant's concern in this regard, we decline to conclude the admission of this statement was plain error, given the remark was fleeting, and the detective did not state the minivan defendant drove on the date of his arrest was the same minivan seen

34

in the footage. Further, a fair reading of the transcript reflects the detective made clear that on the date of defendant's arrest, a colleague suggested to him that defendant's stopped vehicle matched the description of a vehicle used in another reported burglary. Thus, the detective explained that once he arrived on the scene of defendant's arrest and saw defendant's damaged hubcap, he "began conversing with the officers on scene about what they observed"; he did not state he or fellow officers concluded the stopped vehicle was the same vehicle seen on surveillance video.

The nature of Detective McEvoy's testimony about the hammer found in defendant's minivan was along the same permissible lines. During the course of his testimony, Detective McEvoy recalled retrieving the hammer found in defendant's minivan at the time of his arrest "[b]ecause it was in plain view and it matched . . . the description of the item used . . . in the burglar investigations." Again, the detective did not explicitly state the hammer found in defendant's car was the same hammer used in the burglaries. Further, his testimony about the hammer was based on his having personally recovered it from defendant's vehicle, and from viewing surveillance footage containing images of a similar hammer.

Turning to Officer McGowan's testimony, we note he also addressed what he saw on surveillance video, without stating he saw defendant or

defendant's minivan on the footage.   For example, when describing

surveillance video from the burglary at the pet supply store, the officer stated:

> There was one camera . . . pointed towards the front glass doors that was able to observe a blue minivan that pulled up in front of the store, stopped and the suspect got out of the vehicle, entered the store.  When the van's pulling away, you can observe the entire driver's side of the vehicle and I was able to notice that the back hubcap of the vehicle was cracked and broken off.

Asked what he did with the information he gleaned from the footage,

Officer McGowan testified:

> We had multiple burglaries that had happened within the days prior to the [pet supply] store.  So after clearing the scene[,] I went back to our station and started inputting some data into our record management system.  I was looking for blue minivans similar to the type that I saw on the surveillance footage and I came across a blue minivan that was stopped by [a sergeant] the night before.  It had a Pennsylvania registration on it but the driver of the vehicle that he had documented on his motor vehicle stop had actually a New Jersey driver's license that was registered just up the street from [the pet supply store].

When the officer was asked whose name was on the registration of the stopped

vehicle, he gave the name of defendant's wife.

In describing what the officer did after he secured this information, he

stated:

> Because it was just outside of my jurisdiction[,] I was able to drive past the residence that it was registered to. I drove past the residence and the van was in the driveway and I observed the same missing piece of hubcap on the back driver's side tire.

These statements were admissible, as Officer McGowan provided no testimony positively identifying defendant's minivan as the same vehicle seen on surveillance footage. Instead, the officer explained how the footage led the police to pursue additional avenues of investigation.

On balance, given the neutral language law enforcement used to describe their interactions with defendant, their observations of his vehicle and what they perceived from surveillance video, and considering that jurors viewed the surveillance footage for themselves and determined what weight, if any, to give to the testimony of Officer McGowan and Detective McEvoy, we discern no reversible error regarding the challenged lay testimony.

## C.  Defendant's Sentence

Lastly, regarding Point VI, defendant argues he should be resentenced because the judge mistakenly found him ineligible for Drug Court and failed to explain why four consecutive prison terms of equal length were imposed. Although we are not persuaded by these contentions, in an abundance of caution, we remand this matter for resentencing due to the Court's recent holding in Torres.

37

A defendant's sentence is reviewed for an abuse of discretion.  State v. Jones, 232 N.J. 308, 318 (2018).  But "a trial court's application of the Drug Court Statute and Manual . . . involves a question of law," and thus is subject to de novo review.  State v. Maurer, 438 N.J. Super. 402, 411 (App. Div. 2014).

Here, defendant contends the judge erred in deeming him ineligible for Drug Court.[9]  We disagree.  Because defendant was serving an existing prison sentence in Pennsylvania when he was sentenced for his New Jersey convictions, he was unable to participate in Drug Court, but more importantly, his ongoing imprisonment precluded imposition of a non-custodial

---

[9]  As we have observed:

> [T]here are two tracks available for entry into our Drug Courts.  Track One is available to those eligible for special probation pursuant to N.J.S.A. 2C:35-14(a), and who otherwise satisfy the statutory criteria . . . .  Track Two permits applicants to be admitted into Drug Court under the general sentencing provisions of the Code of Criminal Justice.
>
> [State v. Figaro, 462 N.J. Super. 564, 566 (App. Div. 2020) (internal citations and quotation marks omitted).]

probationary sentence. N.J.S.A. 2C:44-5(f)(1).[10] See also State v. Crawford, 379 N.J. Super. 250, 259 (App. Div. 2005).

Also, per Article V of the IAD, the sending State offers "temporary custody" of a prisoner to the receiving State and requires the prisoner to be returned to the sending State "at the earliest practicable time consonant with the purposes of [the IAD]." N.J.S.A. 2A:159A-5(e). Thus, defendant was in New Jersey temporarily under the IAD, and had to be returned to Pennsylvania to complete his sentence there before he began serving his New Jersey sentence. As the judge properly noted, "[D]rug [C]ourt is not available to [defendant] because he's got an out[-]of[-]state sentence that really precludes him from participating. . . . The process is he returns to Pennsylvania . . . to continue the service of his sentence there first."[11]

Additionally, we are not convinced defendant's sentence is excessive. In imposing a sentence, the judge "first must identify any relevant aggravating

---

[10] N.J.S.A. 2C:44-5(f)(1) instructs that a court "shall not sentence to probation a defendant who is under sentence of imprisonment, except as authorized by [N.J.S.A. 2C:43-2(b)(2)]" (the split sentence provision).

[11] Given the passage of time since defendant's sentencing in New Jersey, he may now be eligible for a sentence change under Rule 3:21-10(b)(1) if he has completed his Pennsylvania sentence. This Rule permits a motion for a change in sentence to be filed at any time "to permit entry of the defendant into a custodial or non-custodial treatment or rehabilitation program for drug or alcohol abuse." R. 3:21-10(b)(1).

A-3047-18

and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b) that apply to the case." State v. Case, 220 N.J. 49, 64 (2014). The trial court is required to "determine which factors are supported by a preponderance of [the] evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989).

We cannot "substitute [our] judgment for that of the sentencing [judge,]" State v. Fuentes, 217 N.J. 57, 70 (2014), and are limited to considering:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

When deciding whether to impose a consecutive sentence, trial courts are to consider the following factors outlined under State v. Yarbough, 100 N.J. 627, 643-44 (1985):

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;

> (b) the crimes involved separate acts of violence or threats of violence;

> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

> (d) any of the crimes involved multiple victims;

> (e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors; [and]

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense.[12]

---

[12] The Yarbough Court originally outlined six factors, but the sixth factor, which provided "there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses," was superseded by a 1993 amendment to N.J.S.A. 2C:44-5(a), which states "[t]here shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses."

Recently, the Court reinforced the standards for imposing consecutive sentences and held that "essential to a proper Yarbough sentencing assessment" is "[a]n explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding." Torres, 246 N.J. at 268.

Here, the judge found aggravating factors three, six and nine, N.J.S.A. 2C:44-1(a)(3) (risk of reoffense), (6) (prior criminal history), and (9) (need to deter), and gave these factors "significant weight." Additionally, he found mitigating factor six, N.J.S.A. 2C:44-1(b)(6) (defendant will compensate the victims for damages sustained) and afforded this factor "moderate weight." The judge also concluded the aggravating factors substantially outweighed the mitigating factor.

We see no reason to second-guess the judge's aggravating and mitigating factors analysis, considering defendant's history of substance abuse and significant criminal record, which consisted of "[twenty-five] felony convictions, [and] three misdemeanor disorderly persons convictions[,]" many resulting from burglaries in Pennsylvania during the same period he committed multiple burglaries in New Jersey.

Also, we note that when he applied the Yarbough factors, the judge carefully explained why he found the prison terms imposed should run

42

consecutively, and why he rejected defendant's argument for concurrent sentences. Although defendant urged the judge to impose concurrent sentences for each offense, based on his offenses being "fairly compact" in time and place, and committed with "one sole objective" for committing the crimes, namely "to feed [his] drug habit," the judge rejected this argument, explaining:

> [T]he events of each day appear to be a continuum of criminal activity on the part of the defendant, such that those particular events should run concurrent to each other. However, I do find that the defendant made a conscious decision from one date to the next to go back out and continue his criminal activity. It would be another thing if he continued through the daylight hours into the following day, and the next day, to continue to commit his burglaries . . . along the way, but . . . each individual date he consciously decided to go back out and commit more burglaries rather than stop his criminal behavior. Also, where he had an opportunity to reflect potentially on the criminal behavior the night . . . or the day before, that reflection . . . did not cur[b] his criminal activity. He went back out making that conscious choice.

In giving weight to the first Yarbough factor, i.e., "there [are] no free crimes[,]" the judge reasoned, "[i]f all of these were to be run concurrent[ly], it certainly would minimize the defendant's criminal behavior, and certainly would send the wrong message to the public [so] when they have an opportunity to curb their behavior and they don't, they should [receive] separate and distinct sentences." Additionally, the judge determined

43                                                                  A-3047-18

defendant's sentences should run consecutive to defendant's Pennsylvania sentence because defendant "did not get the message [after] being arrested . . . in New Jersey for . . . criminal conduct, and instead continued to commit crimes in Pennsylvania" in December 2016, following his release from custody in New Jersey.

After imposing concurrent sentences for each batch of burglaries committed on a single day "because they continued relatively close in time, albeit, maybe not geographically . . . close," the judge imposed the standard fines and ordered restitution for various victims.[13] He also noted defendant would be eligible for parole in approximately "five years and four months."[14]

Defendant's aggregate sentence, while harsh, does not shock our judicial conscience. State v. Tillery, 238 N.J. 293, 323 (2019). But in an abundance of caution, we vacate the sentence and remand for resentencing, consistent with the Court's guidance in Torres, to allow the judge to provide "[a]n explicit statement, explaining the overall fairness" of the sentences imposed. 246 N.J. at 268.

---

[13] The judge also properly merged the theft and criminal mischief charges into the burglary charges for each business.

[14] The Department of Corrections website reflects defendant's parole eligibility date is in May 2024.

To the extent we have not addressed any remaining contentions, it is because they lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed as to defendant's convictions and remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION